Robert Binda and Genevieve Binda v. Commissioner.
Binda v. Commissioner
Docket No. 120-62.
United States Tax Court
T.C. Memo 1963-236; 1963 Tax Ct. Memo LEXIS 107; 22 T.C.M. (CCH) 1195; T.C.M. (RIA) 63236; August 30, 1963
*107 1. Withdrawals by petitioner from controlled corporations held to be bona fide loans, not disguised dividends. 2. Fair market value of lots purchased by petitioner from controlled corporation and sold by petitioner to another controlled corporation determined. 3. Excess of fair market value of lots purchased from controlled corporation over amounts paid by petitioner to corporation for the lots constituted dividend income to petitioner. 4. Excess of sales price of lots sold to controlled corporation by petitioner over the fair market value of lots constituted dividend income to petitioner. 5. Five lots sold by petitioner held not to have been property held by petitioner for sale to customers in the ordinary course of his business. Bailey M. Welden, 620 First Federal Bldg., St. Petersburg, *108 Fla., and Alfred E. Underberg, for the petitioners. Richard W. Roe, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax and an addition to tax under section 6654 [1] as follows: Addition to Tax,
Year
Deficiency
Sec. 6654
1958
$13,020.27
1959
29,959.27
$43.35
By amended answer respondent claimed an increased deficiency for the year 1959 in the amount of $10,567.20. The issues for decision are: (1) Whether withdrawals by petitioner Robert Binda (who will hereafter be referred to as petitioner) from Bay Pines Construction Co., Inc., Orange Realty, Inc., Orange Estates, Inc., Temple Realty Co., Inc., and Orange Blossom Homes, Inc. (hereafter referred to, respectively, as Bay Pines, Orange Realty, Orange Estates, Temple Realty, and Orange Blossom), his controlled corporations, in 1958 and 1959 constituted loans or dividends; (2) Whether petitioner realized income in 1959 in the form of a dividend from Orange Manor, Inc. (hereafter referred to as Orange *109 Manor), another corporation controlled by petitioner, as the result of his purchase of realty from that corporation for less than its fair market value; (3) Whether petitioner realized income in 1959 in the form of a dividend from Bay Pines by his transfer of property to Bay Pines for a stated consideration in excess of the fair market value of the property transferred, which stated consideration was credited to petitioner's indebtedness to the corporation; and (4) Whether gain realized by petitioner in 1959 from the sales of lots 132 through 136 of Orange Manor Subdivision is to be treated as gain from the sales of capital assets or as ordinary income. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife who reside in Tampa, Fla. They filed joint Federal income tax returns for the calendar years 1958 and 1959 with the district director of internal revenue, Jacksonville, Fla. Prior to June 17, 1958, petitioner was a stockholder in Bay Pines, Orange Blossom, and Seminole Construction Co., Inc., which were engaged in the construction business, and in Orange Estates, Orange Manor, Orange Realty, and Temple Realty, *110 which were engaged in the real estate development business. Other stockholders in these corporations were petitioner's father-in-law, James Rosati, Sr., and his brothers-in-law, James Rosati, Jr., and Joseph Rosati. The percentages of stock of the foregoing corporations owned by petitioner or by one or more of the Rosatis were as follows: James,
James,
Petitioner
Sr.
Jr.
Joseph
Percent
Corporation
Bay Pines
40
40
20
Orange Blossom
51
49
Orange Estates
50
40
10
Orange Manor
40
50
10
Orange Realty
50
50
Seminole Construc-
tion Co., Inc.
50
50
Temple Realty
50
50
James Rosati, Sr., had been a builder of residential subdivisions for over 10 years. Differences arose between petitioner and the Rosatis and it was decided that petitioner would purchase the shares of stock owned by the Rosatis in the above corporations for $150,000. At this time petitioner's net worth was approximately $200,000. The possibility of having the corporations redeem the Rosatis' shares was considered, but the corporations operated largely on borrowed capital, and surpluses in the corporations were necessary, to obtain this financing. Petitioner *111 did not want to reduce the equity capital of the corporations so he decided to withdraw the funds necessary for the stock purchase from the corporations so they might benefit from the interest that would be paid on the withdrawals. The Rosatis, who were directors of the corporations in which they were stockholders, knew of petitioner's intention to withdraw funds from the corporations to pay them for their shares. By instrument dated June 18, 1958, petitioner and the Rosatis executed an agreement for the sale of all of the Rosatis' stock to petitioner for a total consideration of $150,000, to be paid $128,547.85 to James, Sr., $16,501.65 to James, Jr., and $4,950.50 to Joseph. Petitioner was to pay a total of $25,000 in cash and give each of the sellers a note for the remainder owed him. Specified amounts were to be paid on the notes on or before December 31, 1958, 1959, and 1960, and the agreement provided for interest of 5 percent on the unpaid balances. During the period June 18, 1958, to January 4, 1960, petitioner made the following payments to the Rosatis under the above agreement: Seller
June 18, 1958
Jan. 2, 1959
Oct. 30, 1959
Jan. 4, 1960
James, Sr.
$21,424.64
$17,139.71
$25,000
$15,849.29
James, Jr.
2,750.28
2,200.21
5,500.55
Joseph
825.08
659.07
1,651.17
Total
$25,000.00
$19,998.99
$25,000
$23,001.01
*112 Meetings of the boards of directors of Bay Pines, Orange Estates, Temple Realty, and Orange Realty were held on June 17, 1958. The directors of each corporation at that time were petitioner, his father, and the accountant and office manager of the companies. [2] At these meetings the directors authorized loans to petitioner in the following amounts: Bay Pines, $15,000; Orange Estates, $2,000; Temple Realty, $3,000; and Orange Realty, $5,000. Petitioner executed and delivered to each corporation a demand note in the principal amount of the loan authorized, and each note bore interest at 5 percent, payable annually. At these meetings the directors also authorized the treasurer to secure insurance policies on the life of petitioner. This insurance was of a type commonly known as keyman insurance. The treasurer was instructed by appropriate resolution in each case to keep the policy, of which the corporation was to be beneficiary and owner, in effect and to pay necessary premiums. The face value of the policy secured on behalf of Bay Pines was $45,000; that of the policy of Orange Estates was $30,000; and that of the policy of Temple Realty was $25,000. *113 On the same date the directors of Orange Manor, who at that time were petitioner, his father, and the office manager, authorized payment of premiums on a similar policy on the life of petitioner in the principal amount of $25,000. At the date of trial the following corporations owned and were the beneficiaries of policies of insurance on petitioner's life: Amount of
Corporation
policy
Bay Pines
$45,000
Orange Manor
25,000
Temple Realty
25,000
Orange Estates
30,000
Seminole Construction Co., Inc.
40,000
Orange Blossom
25,000 The foregoing corporations have borrowed funds on the policies. Minutes of meetings of the board of directors of Bay Pines and of Orange Blossom, dated January 2, 1959, authorized loans to petitioner in the respective amounts of $15,000 and $5,000. Petitioner executed and delivered demand notes dated January 2, 1959, to the corporations for these sums, which notes recited a rate of interest of 5 percent, payable semiannually. Minutes of meetings of the boards of directors of Temple Realty and Orange Estates held on October 30, 1959, authorized loans to petitioner in the respective amounts of $7,000 and $18,000, and petitioner *114 executed and delivered to the corporations demand notes in the principal amounts of these sums, which notes recited interest of 5 percent. Petitioner received the amounts from the corporations on the dates they were authorized as loans by the directors. In addition he received the amount of $5,549.75 from Orange Blossom on April 8, 1959, and the amount of $2,000 from Bay Pines on December 31, 1959. By inadvertence, resolutions of the boards of directors of Orange Blossom and Bay Pines authorizing these loans were not formally adopted. In summary, petitioner received the following sums from the above corporations on the dates indicated: Orange
Orange
Orange
Temple
Disbursement
Bay Pines
Blossom
Estates
Realty
Realty
Total
June 17, 1958
$15,000
$ 2,000
$5,000
$3,000
$25,000.00
Jan. 2, 1959
15,000
$5,000.00
20,000.00
Apr. 8, 1959
5,549.75
5,549.75
Oct. 30, 1959
18,000
7,000
25,000.00
Dec. 31, 1959
2,000
2,000.00
The above amounts which petitioner received from Bay Pines, Orange Estates, Temple Realty, Orange Realty, and Orange Blossom were all shown on the books of the corporations as notes *115 receivable from petitioner. The notes which he delivered to the corporations had necessary documentary stamps affixed. Petitioner gave no collateral as security for any of the withdrawals. The above corporations each employed the accrual method of accounting. The books of each were maintained on the basis of a fiscal year. The fiscal years of Bay Pines, Seminole Construction Co., Inc., and Temple Realty ended September 30; that of Orange Blossom, March 31; that of Orange Estates, April 30; that of Orange Manor, October 31; and that of Orange Realty, August 31. Interest on petitioner's withdrawals was not accrued on the books of the corporations until the fiscal years ending in the latter half of 1959 due to the fact that some of the records of the corporations were in the hands of counsel and were not available to the accountant who audited the books at yearend and who prepared the income tax returns of the corporations. However, total interest from the dates of the notes was accrued in the first taxable years after the accountant came into possession of the directors' resolutions authorizing the loans to petitioner. Petitioner paid no interest on any of the above loans prior to *116 September 11, 1961, except the amount of $300.68 paid to Orange Realty on September 25, 1959. Petitioner paid Bay Pines the amount of $11,000 on January 8, 1960, the amount of $10,000 on June 8, 1960, and the amount of $3,877.17 on September 11, 1961. These amounts were credited to his indebtedness to the corporation. His account with Bay Pines was also credited with the sum of $16,500 ($15,000 to a prior loan made in 1957), representing the stated consideration for the sale on August 13, 1959, by petitioner to Bay Pines of lots 135 and 136 as hereafter mentioned. He made no other payments to the corporations until September 11, 1961. On September 11, 1961, petitioner also paid Bay Pines $3,122.83 which was credited to accrued interest to date on his account with Bay Pines; on November 16, 1961, he paid Bay Pines $7,622.83 which paid his account with that corporation in full including accrued interest. On November 30, 1961, petitioner's accounts with Orange Blossom and Orange Realty were credited with the amounts of $10,549.75 and $5,500, respectively, which were the balances due on those accounts, [3] and his account with Temple Realty was credited with $4,000 which left a balance *117 in his account with that corporation of $7,000 plus accrued interest. Each corporation from which petitioner received funds had accumulated earnings and profits in an amount exceeding petitioner's withdrawals, except that the earnings and profits of Orange Realty, which was incorporated September 26, 1957, were not in excess of $3,982 as of August 31, 1958, the end of its first taxable year. None of the corporations had ever declared or paid a formal dividend. Generally, financial statements of petitioner showed the amounts withdrawn from the corporations as notes payable, that is, as liabilities owed by him. On July 12, 1960, an informal conference regarding petitioners' income tax liability for the taxable year 1958 was held by representatives of the Internal Revenue Service, which was attended by petitioner and his representatives. Petitioner attended subsequent conferences with respondent's representatives concerning his tax liability for both 1958 and 1959, the last of which was held on July 27, 1961. The notice of deficiency herein was issued on October 5, 1961. Orange Manor *118 owned and developed a subdivision in Pinellas County, Fla., known as Orange Manor, which was bounded on the east by a heavily traveled highway, U.S. 19-A. Orange Manor Subdivision consisted of 158 building lots zoned for residential purposes and of an unplatted section on its eastern edge fronting on U.S. 19-A measuring approximately 210 by 600 feet which had a commercial zoning classification. Except for the perimeter configurations and locations the physical characteristics of all the numbered lots were essentially the same. There were two streets into Orange Manor Subdivision entering from U.S. 19-A. Lots 132 through 137 bounded the street which was the northern entrance into the subdivision. Lots 135, 136, and 137 were on the north side of this street, with lot 135 also fronting on U.S. 19-A. Lots 132, 133, and 134 were on the southern side of this street, lying between the street and the unplatted section mentioned above, with lot 134 also fronting on U.S. 19-A. On January 20, 1959, Orange Manor conveyed lots 132, 133, 134, 135, and 136 of Orange Manor Subdivision to petitioner. As consideration for this conveyance petitioner agreed to pay Orange Manor the total sum of $4,279.70, *119 or $855.94 per lot. This amount was entered on the books of Orange Manor as a receivable from petitioner. Petitioner paid $2,600 on this account on October 30, 1959. Prior to the sale of lots 132 through 136 to petitioner these lots had been offered for sale by Orange Manor to the general public for 2 or 3 years. The asking price, which was subject to negotiation, was about $2,300 per lot. In January and February 1959, Orange Manor sold lots 137, 138, and 139 for $2,300 each, lot 130 for $2,500, and lot 131, which was a corner lot, for $3,000. It had been rumored that U.S. 19-A was to be widened to four lanes and lots 132 through 136 were not considered as desirable for residential building as lots which were not adjacent to the highway. On January 21, 1959, petitioner filed an "Application For Change of Zoning" with the Board of County Commissioners of Pinellas County, Fla. In this application he requested that the zoning classification of lots 132 through 136 be changed from residential to a commercial classification. In this application petitioner represented that he desired to construct executive offices for his occupancy on lots 135 and 136 and that he desired to have lots 132, *120 133, and 134 zoned in the same classification as the adjoining unplatted property in order to complete the commercial zoning of the block fronting U.S. 19-A. The application was considered by the Board of County Commissioners at a meeting on February 19, 1959. The assistant director of planning and zoning recommended that lots 135 and 136 be zoned P-1 for professional offices, that lots 133 and 134 be zoned C-1 for neighborhood business, and that the residential classification of lot 132 be unchanged. Petitioner appeared before the board and agreed to revise his application to request P-1 classification for lots 135 and 136 and C-1 classification for lots 132, 133, and 134 when it was indicated that an application so revised would be approved. A resolution rezoning the lots in accordance with the modified application was adopted at the meeting. Petitioner was officially notified of the action of the board on March 9, 1959. Petitioner decided that his corporations required additional office space in the building where space was leased, but he found that the total rent required for more room would be $350 per month. He discussed the matter with the savings and loan association from *121 which he usually borrowed funds for construction and was advised to construct his own office building. On July 31, 1959, he submitted an application on behalf of Bay Pines for a construction loan in order to construct a commercial-professional building on lots 135 and 136. On August 13, 1959, petitioner transferred lots 135 and 136 to Bay Pines for a stated consideration of $16,500. The $16,500 was credited by Bay Pines to petitioner's loan account, $15,000 being credited to a loan in that amount made to petitioner by Bay Pines in 1957, and $1,500 being credited to the loan made to petitioner by Bay Pines on June 17, 1958. Bay Pines applied for a building permit for the construction on August 18, 1959. On October 26, 1959, petitioner sold lots 132, 133, and 134 to Salvador Greco (hereafter called Greco), and on the same date Orange Manor sold Greco the unplatted section which adjoined lots 132, 133, and 134 and which fronted on the highway. Greco agreed to pay $70,000 for the three lots and the unplatted tract, of which $60,000 was allocated to Orange Manor and $10,000 to petitioner. But Greco and petitioner also agreed that petitioner was to attempt to have the zoning classification *122 of the numbered lots changed from C-1, neighborhood business, to C-2, general business, and that if petitioner did not succeed in getting the three lots rezoned, he would forfeit to Greco $500. At the closing petitioner was required to forfeit the sum of $500 since he had not had the zoning classification changed. Ultimate Facts Petitioner's withdrawals from Bay Pines, Orange Realty, Orange Estates, Orange Blossom, and Temple Realty were intended by the parties to be, and were bona fide loans from the corporations to petitioner. The fair market value of lots 132 through 136 on January 20, 1959, was $12,500, or $2,500 each. Petitioner realized income in 1959 in the form of a dividend from Orange Manor in the amount of $8,220.30 by reason of his purchase of lots 132 through 136 from Orange Manor for $4,279.70, when the fair market value of the lots was $12,500. The fair market value of lots 135 and 136 on August 13, 1959, was $10,000, or $5,000 each. Petitioner realized income in 1959 in the form of a dividend from Bay Pines in the amount of $6,500 by reason of the conveyance of lots 135 and 136, having a fair market value of $10,000, to Bay Pines in discharge of his indebtedness *123 to Bay Pines in the amount of $16,500. Petitioner did not hold lots 132 through 136 for sale to customers in the ordinary course of his business at the times he sold these lots in 1959. Opinion Respondent maintains that the amounts which petitioner withdrew from Bay Pines, Orange Estates, Temple Realty, Orange Realty, and Orange Blossom in 1958 and 1959 constitute taxable dividends to the extent of the earnings and profits of the corporations. It is petitioners' position that the amounts represent the proceeds of loans which, of course, would be nontaxable. That petitioner received the funds from the corporations in the amounts and on the dates set forth in our findings is undisputed. Whether the amounts represent loans or the distributions of corporate earnings and profits to petitioner, the sole stockholder of the corporations, is an issue of fact to be decided on the entire record. (C.A. 8, 1938), affirming , certiorari denied , rehearing denied ; ; . *124 All material factors in a particular case are to be considered and weighed, but the critical inquiry is whether petitioner intended, when the withdrawals were made, that they be loans which he was to repay. ; ; ; ; The evidence under review does not point unmistakably to a single conclusion, but it fairly shows in its entirety that petitioner intended the amounts to be loans when he received the sums from the corporations, and we have so found as an ultimate fact. That petitioner was sole stockholder of the corporations invites our careful scrutiny, see ; but despite the fact that this circumstance offers the opportunity for manipulation of the affairs of the corporations it is not conclusive on the issue, and we have recognized that a sole stockholder may be a bona fide debtor of his corporation for tax purposes. See In reaching our conclusion here we have recognized that petitioner was *125 in effective control of the corporations, not only when the sums were withdrawn but when the loans were planned. While the Rosatis were stockholders at the time the loans were planned, and it could be argued that they could have prevented the withdrawals, once the plan and the price were agreed upon the Rosatis had no further interest in the corporations. They became creditors of petitioner and had a claim directly against him; they did not have to claim through the corporations. Therefore, although there were stockholders other than petitioner when the loans were planned, it is possible that the amounts received by petitioner represented dividends. See In fact, the situation offered a tax motive for petitioner's withdrawal of earnings and profits in the guise of borrowings. We have viewed it in that light. Treatment of the withdrawals on the books of the corporations and on petitioner's financial statements support the conclusion that the withdrawals were loans, and petitioner executed and delivered demand notes, proper in form and bearing documentary stamps, to the corporations when the amounts were received - not after this litigation arose. *126 Cf. Petitioner testified that he borrowed the funds from the corporations in order that they might benefit from interest payments rather than an outsider, and it is probably true that he could have borrowed the sums from some other parties. Interest on the loans has been accrued on the books of the corporations. It is true that these amounts were not accrued in the first taxable years of the corporations, but this failure was due to an oversight and full interest at 5 percent from the dates of the withdrawals was accrued before petitioners' income tax liability came under examination. These bookkeeping entries are neither concealment of realities nor an afterthought. Cf. They must be given consideration. See To the date of trial, there had been various credits to petitioner's accounts on the books of the various corporations. On August 31, 1959, when petitioner transferred lots 135 and 136 to Bay Pines, his account with that corporation was credited with the sum of $16,500, of which $15,000 was credited to a prior loan and $1,500 was credited to the "loans" here in question. *127 And in January 1960 petitioner repaid the amount of $11,000 to Bay Pines. These credits were admittedly prior to the time that an internal revenue agent contacted petitioner regarding his tax liability. Petitioner repaid Bay Pines the amount of $10,000 in June 1960, which may have been after the examining officer first contacted him, and in September 1961, after the dispute arose, petitioner repaid the sum of $3,877.17, the balance due on this loan account, plus $3,122.83 for all interest accrued. These credits, particularly that of January 1960, evidence a bona fide obligation. We find no pattern of withdrawals over a period of time that indicates petitioner was systematically extracting corporate funds as they were earned. A comparison of the dates and amounts of the withdrawals with the dates petitioner made payments to the Rosatis on the purchase price of their stock indicates that the withdrawals were made to meet these obligations. Although petitioner had a net worth sufficient to cover these obligations and had a substantial income each year, his assets consisted mostly of his home and his stock in these corporations and it is doubtful that he could have paid these obligations *128 as they came due without borrowing money. And even though the loans to petitioner were unsecured, they were recorded on the books of the corporations and would have been available to creditors of the corporations, and the corporations held life insurance on petitioner's life which would have made his stock in the corporations valuable in the case of his death. We believe the preponderance of the evidence supports the book entries and petitioner's testimony to the effect that the withdrawals were intended to be, and were in fact, loans and we have so found. On January 20, 1959, petitioner bought lots 132 through 136 of Orange Manor Subdivision from Orange Manor for $4,279.70, which respondent claims was less than their fair market value. Later in 1959 he sold these lots at a profit, lots 135 and 136 being sold to Bay Pines at a price which respondent claims was in excess of their fair market value. Respondent determined that the difference in the fair market value and the sales price in each instance constituted a taxable dividend to petitioner. It thus became necessary for us to determine the fair market value of these lots on the critical dates. At the request of both parties, *129 the court made its findings of these values at the conclusion of the trial and announced them from the bench. We found that the fair market value of lots 132 through 136 on January 20, 1959, was a total of $12,500, or $2,500 per lot. This represented our best judgment of value from all the evidence presented, which did not include the testimony of experts but did include evidence of the prices for which lots in this subdivision had been offered for sale and prices at which some of them had actually been sold near the same time. We also found that the value of lots 135 and 136 was a total of $10,000, or $5,000 each, on August 13, 1959, when they were transferred by petitioner to Bay Pines for a stated consideration of $16,500, which was credited to petitioner's loan account. This was also our best judgment of value from all the evidence presented, giving recognition to the fact that petitioner had had these lots rezoned for professional use after he acquired them and before he sold them, that an unrelated party paid about $100 per front foot for the unplatted commercial property fronting on U.S. 19-A and somewhat less for lots 132-134 which had only a limited commercial classification, *130 and that other nearby commercial property fronting on U.S. 19-A was selling for about $100 per front foot. The evidence indicated that, beyond a certain point, the depth of commercial property does not materially affect the front foot selling price. Respondent contends that petitioner realized $8,220.30 of income in the form of a dividend from Orange Manor by virtue of the transaction in which he acquired lots 132-136 from Orange Manor for $4,279.70 when their fair market value was $12,500. It is settled that a stockholder may be deemed to have received a distribution of the earnings and profits of his corporation upon the purchase of property from it at less than fair market value. ; ; see . Petitioners do not controvert that the purchase of the lots at less than value had the result of a dividend. The earnings and profits of Orange Manor for the critical period were in excess of the difference between the purchase price and the value of the lots, and we have found for respondent on this issue. Respondent also *131 contends that petitioner realized income in the form of a dividend from Bay Pines as a result of the transaction whereby he transferred lots 135 and 136, which had a fair market value at the time of $10,000, to Bay Pines for a stated consideration of $16,500 which Bay Pines credited to petitioner's loan account. Respondent relies on two general principles to sustain this contention. The first is that a shareholder may be deemed to receive a dividend from his corporation upon the transfer to it of property for an amount in excess of the fair market value of the property. (C.A. 9, 1962), affirming a Memorandum Opinion of this Court; , affirmed per curiam (C.A. 2, 1955). The second is that if the controlling stockholder borrows money from his corporation, he realizes dividend income when the corporation later cancels the debt. Petitioners do not dispute these principles or that the debt was canceled; they argue only that the proper treatment of the transaction is to eradicate the credit on the books of Bay Pines, *132 that is, to consider now that petitioner is still indebted to Bay Pines in the amount of the excess for which he was given credit. This, of course, we cannot do. We are concerned with the tax liability of petitioners for the year 1959 and that liability is to be determined on the basis of facts now crystallized. We cannot change those facts nor direct how they may be changed. We are not presented with the situation where correcting books entries are made to prevent the inadvertent inference of a dividend when none was intended. There is no evidence of such a correction and we must take the fact of cancellation of the debt as we find it. We have found for respondent on this issue. With respect to the above transaction, respondent, in his notice of deficiency and his pleadings, appears to claim that petitioner received only $5,000 additional income, although the amount credited to petitioner's account by Bay Pines was $6,500 more than the fair market value of the lots transferred. This is apparently on the theory that the only bona fide indebtedness of petitioner to Bay Pines was the $15,000 loan made in 1957 and that there was no additional indebtedness to which the remaining $1,500 *133 of excess price could properly be credited. But inasmuch as we have found that petitioner's withdrawals from Bay Pines subsequent to 1957 created a bona fide indebtedness from petitioner to Bay Pines and the additional $1,500 was credited on that indebtedness, with interest thereafter being computed on the net balance, we find no logical reason for treating the $1,500 any differently for tax purposes than the $5,000. We have therefore found that petitioner realized income in the amount of $6,500 as a result of this transaction. Respondent may amend his pleadings if necessary to cover this situation. See (C.A. 4, 1935); The sales price of the two lots for purposes of computing petitioner's gain on the transaction will be considered to be $10,000. For purpose of completeness, we also find that the sales price of lots 132-134 sold to Greco was $9,500. The final issue is whether petitioner realized ordinary income or capital gains on the sales of lots 132, 1333, and 134 to Greco and of lots 135 and 136 to Bay Pines. [4] Both sales occurred in 1959. This question depends upon whether *134 petitioner's gains resulted from sales of property held primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1) and therefore constituted ordinary income. The question is one of fact to be determined upon all the circumstances of the case, but among the factors to be considered are the taxpayer's purpose for acquiring the property in question and disposing of it; the continuity of sales or sales-related activity over a period of time; the number, frequency, or substantiality of sales; and the extent to which the taxpayer or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising, ; ; . None of these factors is conclusive, but the taxpayer's purpose in acquiring the property is to be accorded considerable weight, particularly in reaching a conclusion as to his purpose in holding the property. The latter point is critical. (C.A. 6, 1960), affirming *135 . So far as the record indicates, petitioner's only trade or business was that of an employee and officer of his corporations. It is true that several of these corporations were engaged in the business of developing and selling real estate, but the business of the corporations is not to be imputed to petitioner merely because of his position as an officer and stockholder. . Petitioner testified that he bought the lots for "investment." It appears from his application for rezoning that he intended to build an office building on lots 135 and 136.of course, that is what was ultimately done with the properties and it may well have been contemplated when petitioner applied for the rezoning classifications that he would sell lots 135 and 136 to Bay Pines for the construction of the office building, just as it may well have been contemplated that he would sell lots 132, 133, and 134 to the purchaser of the property of Orange Manor which had a commercial zoning classification. But it is not enough for purposes of *136 section 1221(1) that petitioner held the lots for sale; they must have been held for sale in the ordinary course of his business, and the only evidence upon which can be based a finding that petitioner engaged in the business of selling real property is that of the two sales in question. He bought or sold no other realty. The lots were zoned differently from the residential lots in Orange Manor Subdivision and were located so that their character was different from the lots in the subdivision that were being sold to the public generally. See . Gains from the sales, particularly as reconstructed in the light of our holdings on prior issues, were not substantial when compared to petitioner's total income. The sales to Greco and to Bay Pines do not exhibit that frequency and continuity that would be expected if petitioner's trade or business had been dealing in realty. We have found for petitioners on this issue. Decision will be entered under Rule 50. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
2. Except in the case of Orange Realty, the directors of which were the two petitioners and Robert's father.↩
3. It appears that Orange Blossom and Orange Realty were liquidated on November 30, 1961.↩
4. Respondent recognizes that petitioner's transfer of the lots to Bay Pines was a "sale."↩